Filed 6/30/14  C.C. v. Superior Court CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| C.M.,<br><br>   Petitioner,<br><br>  v.<br><br>THE SUPERIOR COURT OF SANTA CLARA COUNTY,<br><br>   Petitioner,<br><br>SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES,<br><br>   Real Party in Interest. | H040863<br>(Santa Clara County<br> Super. Ct. Nos. JD21328, JD21329, JD21330) |

## I.  INTRODUCTION

C.M. is the mother of B.M., J.O., and Y.O., the children at issue in this juvenile dependency case.  The mother has filed a petition for writ of mandate seeking review of the juvenile court's orders terminating her reunification services and setting a Welfare and Institutions Code section 366.26[1] permanency planning hearing.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

In her writ petition, the mother contends the juvenile court erred by finding that the Santa Clara County Department of Family and Children's Services (the Department) offered her reasonable reunification services. For the reasons stated below, we find that the juvenile court's findings and orders are supported by substantial evidence, and we will therefore deny the mother's writ petition.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     *Section 300 Petition and Initial Hearing Report*

On July 23, 2012, the Department filed petitions under section 300, subdivisions (b) [failure to protect] and (d) [sexual abuse], alleging that the children came within the jurisdiction of the juvenile court. At the time, B.M. was 10 years old, J.O. was four years old, and Y.O. was 16 months old.

C.M. was the mother of all three girls. B.M.'s father was deceased. P.O. was the father of both J.O. and Y.O. All three children had been living with the mother and P.O.

There was a history of domestic violence between P.O. and the mother, some of which B.M. had witnessed. In 2009, the mother and P.O. had participated in Voluntary Family Maintenance Services and they had completed a parenting class.

On May 29, 2012, B.M. and J.O. had rashes and redness near their anuses. They were diagnosed with anogenital warts, and they tested positive for syphilis. On June 28, 2012, Y.O. had a rash near her anus. She was diagnosed with viral warts. The parents could not explain how the two children had contracted syphilis.

The mother had been aware of the redness around B.M.'s anus since February of 2012. She believed B.M. had contracted the warts at their previous residence, where they shared a bathroom with others and often had no toilet paper. The mother acknowledged that she herself recently had " 'bumps' inside of her vagina," but she denied that she had genital warts. The mother admitted knowing that P.O. had previously contracted syphilis. The mother did not suspect that any of the children had been sexually abused. When the

2

social worker explained to the mother the process by which sexually transmitted diseases were contracted, the mother stated "that she knew because it had already been explained to her by the doctors."

B.M. denied that anyone, including P.O., had inappropriately touched her or sexually abused her. The children were being referred for further testing to ensure that the syphilis had not entered their central nervous systems. Y.O. was being referred for x-rays since she did not crawl or walk. Y.O. also did not communicate.

### B. *Detention Hearing*

At the detention hearing held on July 24, 2012, the juvenile court found that continuance in the parental home would be contrary to the children's welfare and that removal from the parents' custody was necessary to protect the child's physical or emotional health. The court therefore determined that a prima facie showing had been made that the children came within section 300, and it ordered the children detained.

The juvenile court directed the Department to provide the parents with referrals to parent orientation, parent education, drug and alcohol assessment, drug testing, and domestic violence counseling. The court further ordered that the parents have supervised visitation with the children two times per week for two hours. Additionally, the parents were ordered to seek medical attention.

### C. *Jurisdiction and Disposition Reports*

The Department's jurisdiction/disposition report recommended reunification services be provided to both parents. At the time of the report, the three children were all living together in an emergency satellite foster home.

The Department had provided the mother and P.O. with information about applying for free sexually transmitted disease testing at Planned Parenthood. The mother subsequently reported that both she and P.O. had been tested and that they were both positive for syphilis. The children's medical tests had revealed no nervous system

3

damage from the syphilis, and they had begun taking penicillin. Two doctors confirmed that the children's syphilis had to have been sexually transmitted.

The parents had attended supervised visitations with the children, who enjoyed the visits. The Department opined that before the children could be returned to the parents, there would have to be some resolution of the question of how the children had contracted syphilis. Both parents continued to have no explanation, and the mother denied that the children had ever been left alone with anyone, including P.O. The Department was also concerned about P.O.'s drug and alcohol use and domestic violence.

The recommended case plan for both parents included a parenting class, a domestic violence assessment, and continued supervised visitation two times per week. As to P.O., the recommended case plan included weekly drug testing and a substance abuse assessment.

### D.      *Jurisdiction/Disposition Hearing*

A jurisdiction/disposition hearing was held on August 24, 2012. That day, the Department prepared and filed a first addendum report. The mother had completed a Parent Orientation class and the social worker was trying to find a Spanish interpreter so the mother could begin a basic parenting class later in the month. B.M. had been referred for counseling services.

At the hearing, both parents submitted the petition on the basis of the Department's reports. The juvenile court adopted the findings and orders contained in the Department's jurisdiction/disposition report: It found the allegations of the section 300 petition true, declared the children dependents of the court, ordered the children's out-of-home placement to continue, and ordered reunification services.

### E.      *First Interim Review*

A case plan review hearing was held on October 12, 2012. The Department submitted an interim review report for the hearing.

4

The mother had not attended two Parent Orientation classes that had been scheduled for her. She had been enrolled in an English speaking parenting class, where she was assisted by a Spanish language interpreter, but she was advised to attend a Spanish speaking class instead. P.O. was scheduled to begin the Spanish speaking parenting class and he had not been referred to complete the domestic violence assessment. P.O. had completed the substance abuse assessment and had been referred for intake at a treatment center. Both parents had consistently visited the children.

Y.O. had been referred for more medical tests and had qualified for services through the San Andreas Regional Center.

J.O. was doing well. During a phone call with P.O., she had refused to send him a kiss over the phone and had explained, "because you poke me." J.O. had also reported to her foster parents that P.O. "pokes" her in the lower back and that it hurt.

B.M. was also doing well. She had been meeting with a therapist on a weekly basis. The social worker was concerned about the amount of physical contact between B.M. and P.O. during visits.

The Department recommended that both parents participate in individual counseling "to address the responsibility and accountability of the sexual abuse of their children." Both parents continued to indicate they did not know how the children contracted syphilis.

At the October 12, 2012 review hearing, the juvenile court adopted the Department's recommendations. The court specifically ordered "counseling for each parent to address sexual abuse and exposure to sexual assault."

### F.    Six-Month Review

A six-month review hearing was held on March 1, 2013. The Department submitted a status review report for the hearing, recommending that both parents receive an additional six months of reunification services.

5

The report described the parents as "intact." Both were unemployed but worked "sporadically" at odd jobs. The children remained together in a foster home. B.M. continued to meet with her therapist.

The mother had been referred to a parenting program, a domestic violence support group, and a Parent Advocate. She had completed the Parent Orientation and was participating in a domestic violence support group. She had been referred for individual counseling and had begun seeing a therapist. P.O. was also seeing a therapist. He had completed a parenting class, and all his drug tests had been negative.

The mother and P.O. continued to visit regularly with the children. During the visits when P.O. was present, the mother was not very engaged with the children. When P.O. was not present, the mother was more engaged with the children.

The mother did not express any areas of need for herself or the children. She did not discuss the children's sexual abuse openly. She denied that she had sexually abused the children or that she suspected anyone of sexually abusing them. She did not suspect that P.O. had sexually abused the children, despite knowing about his syphilis. P.O. likewise continued to deny knowing how the children contracted syphilis. Both parents "remain quiet and simply stare when asked about how they will ensure the safety of the children from further abuse."

The social worker opined that the parents were both "making some progress" in their case plans. They had been cooperative and wanted to reunify with the children. Since they had just begun counseling, they had not yet had "an adequate amount of time to address the sexual abuse of their children in therapeutic sessions." The social worker believed it was "critical that the parents acknowledge the safety risks that the children have been previously exposed to and develop a plan to protect them in order to ensure the safety of the children before reunification can occur."

The Department recommended the juvenile court order the parents to participate in and successfully complete a counseling or psychotherapy program addressing

6

"information and knowledge of sexual abuse, developing a safety plan to ensure and protect the children, identifying risk factors, identifying appropriate caretakers, taking responsibility and being accountable for the abuse." At the six-month review hearing held on March 1, 2013, the juvenile court adopted the Department's recommendations.

### G. Second Interim Review

Another interim review hearing was held on June 7, 2013. The Department submitted a report for the hearing, in which it recommended that all prior orders remain in effect. A treatment summary from the mother's therapist was attached to the report.

Between February 12, 2013 and May 7, 2013, the mother had completed 12 individual counseling sessions "as per the program approval limits." The counseling had addressed various themes, including "[w]hether or not her daughters were sexually abused and how they could have obtained this STD," and "[u]nderstanding how sexual abuse can be generational and what limits/boundaries and communication is needed to help further identify and/or prevent any further unsafe or unhealthy interactions." Although the mother believed the 12 sessions had been "sufficient for her learning process," the therapist believed the mother had not learned enough skills. The mother still could not identify how her daughters contracted a sexually transmitted disease, and she still could not discuss the issue of possible sexual abuse. The therapist thought it would be beneficial for the mother to continue receiving counseling and/or a psychological/medication evaluation "to further clarify how much she is understanding and what changes she is making."

According to the social worker, the mother continued to find it hard to understand how the children had been sexually abused. She continued to deny any abuse by P.O. or herself. She remained together with P.O. despite previously indicating they planned to separate because of his alcohol use. The social worker found the mother's failure to comprehend the sexual abuse "concerning." The mother did not engage when the social worker talked to her about sexual abuse and how to protect the children from sexual

7

abuse. Neither parent appeared to be "particularly interested in finding out how the children tested positive for sexually transmitted diseases." Neither parent could describe what they would do differently to protect their children from future sexual abuse.

At the interim review hearing held on June 7, 2013, the juvenile court ordered the Department to "look into more funding for the mother to continue in additional counseling and services," and it ordered the mother's attorney to "look into having a ne[u]rological evaluation perform[ed] on the mother."

### H. First Status Report for 12-Month Review Hearing

The Department prepared a status review report for the 12-month review hearing, which was initially set for August 23, 2013. In the report, the Department recommended termination of reunification services for both the mother and P.O., and it recommended the juvenile court set a selection and implementation hearing.

The mother and P.O. were living together and "remain[ed] together as a couple." Neither the mother nor P.O. had provided any information to help determine who had engaged in sexual conduct with the children. They both continued to deny that either of them had any involvement in the sexual abuse and claimed they did not know how the children could have contracted a sexually transmitted disease.

Following the completion of the mother's 12 counseling sessions and the therapist's recommendation of additional sessions, the social worker had asked for "a Director's approval" of additional sessions. The social worker had also asked the therapist to write up a summary and recommendations, but the therapist needed to speak with the mother first, in order to "confirm her commitment to the continued sessions" and get a signed release. The therapist had not yet made contact with the mother.

The social worker had looked into a group for parents with children who were victims of sexual abuse, but the family did not qualify for the group, for several reasons. One reason was that the group was for only families in which the parents are not the offenders, but it was still unknown who the offenders were in this case.

8

The social worker recommended termination of reunification services based on the fact that, despite the services they had received, the parents had not been able to verbalize how they would protect their children from further sexual abuse. The social worker believed that returning the child to either parent would create a substantial risk of detriment to the children's safety.

On August 23, 2013, the 12-month review hearing was continued for a contested hearing. On that date, the juvenile court requested the parties submit trial briefs addressing whether the court could terminate reunification services, despite the parents' compliance with their case plans, where it remained unknown how the children contracted syphilis.

## I.    *First Psychological Evaluation of Mother*

The mother was evaluated by Martin H. Williams, Ph.D., a psychologist, on September 23, 2013. Dr. Williams felt that the mother displayed "appropriate concern with regard to potential sexual abuse of her children," although she did not believe the children had actually been abused and she did not believe P.O. had done anything sexual to them. The mother indicated that if she were to learn that the children had been sexually abused, she would notify the police and ensure the children received "proper support."

Dr. Williams felt the mother did not "understand the nature of medical science" since she was still not persuaded that "one cannot contract syphilis except through direct sexual contact." Dr. Williams recommended the mother continue to receive services to facilitate her understanding. He attributed her failure to believe the medical science as a product of her culture and lack of education.

## J.    *Trial Briefs*

In her trial brief, filed on October 9, 2013, the mother indicated she would be asking the juvenile court to "find a lack of reasonable services and give her additional time equivalent to that time she was not getting reasonable services." The mother

9

specifically sought further individual counseling, unsupervised visitation, and conjoint counseling with B.M.

In its trial brief, filed on October 11, 2013, the Department indicated that it would present evidence that "it would be detrimental to the safety, protection or physical or emotional well-being of the children to be returned to the parents, notwithstanding their compliance with their court-ordered services."

### K. Disclosure/Addendum Report

The Department filed an addendum report dated November 22, 2013, describing a recent disclosure by B.M.

On October 23, 2013, B.M. had been searching the internet for sex-related websites. B.M. initially did not want to explain why, telling her caretakers that she feared "she would never be able to see her parents." However, B.M. then disclosed that P.O. had molested her. B.M. said she did not think her mother cared enough about her to protect her, and she worried "about being safe if she was returned to her mother."

Following B.M.'s disclosure, on November 12, 2013, the social worker met with P.O. At the time, the mother and P.O. were living apart but still saw each other and had not "specifically verbalized that their relationship is over." After being confronted with B.M.'s disclosure, P.O. initially said nothing. When questioned, he stated that B.M. must have been pressured to make the disclosure. He had already spoken to the mother about B.M.'s disclosure; the mother had told him that B.M. was a liar.

The social worker also met with the mother on November 12, 2013. The mother confirmed she was not living with P.O. but that she still communicated with him. She had separated from P.O. because of his drinking and "hanging around with his friends too much." When told of B.M.'s disclosure, the mother indicated she wanted to talk to B.M. herself. The mother was not particularly upset or disturbed by B.M.'s disclosure. She had already spoken to P.O. and he had denied the molestation. The mother stated that B.M. "doesn't tell the truth." When asked how she would protect the children, the

10

mother said she would take the children to school, get a job, and rent a studio for them. When asked to specifically address prevention of future sexual abuse, the mother said she would talk to B.M. and go to classes to learn how to talk to the children. The mother claimed she, too, had been the victim of sexual abuse as a child.

The social worker addressed the issue of additional counseling for the mother. After the mother completed 12 sessions, the Department requested additional funds for additional sessions. The mother was instructed to contact the therapist to help develop a plan for another 12 sessions. The mother had recently contacted the therapist but the therapist had not yet provided the information necessary for the Department's additional funding request.

### L. Post-Disclosure Orders

On November 22, 2013, the 12-month review hearing was again continued. On that date, the juvenile court issued a number of orders. The mother was to be referred to Catholic Charities. The mother and B.M. were to receive conjoint counseling with their therapists. The mother was to be directed "to safe housing." The mother was to have her visits increased "in a safe way." P.O.'s visitation was terminated. A temporary restraining order was issued protecting the mother and the children from P.O. A safety plan was to be implemented "in order for possible reunification with mother."

### M. Second Psychological Evaluation of Mother

Dr. Williams evaluated the mother again on January 8, 2014. The mother acknowledged that P.O. had sexually abused B.M., but she remained in denial as to J.O. However, when Dr. Williams "took her through the logical sequences of known facts," the mother acknowledged that P.O. must have sexually abused J.O. as well. This showed that additional psychotherapy would likely assist the mother "in removing denial as a coping skill and replacing it with more effective responses." Specifically, "six months of weekly psychotherapy would make a substantial difference."

11

***N.    Sanctions Motion, Further Addendum Reports, and Children's***

***Restraining Order Request***

On January 13, 2014, the mother filed a motion for sanctions against the Department. The mother sought sanctions for the Department's failure to arrange a therapeutic visit between herself and B.M. and for its failure to comply with the court-ordered visitation schedule. The mother claimed her visitation had not only "never been increased" but that she had only seen the children three times since the November 22, 2013 hearing. In addition to monetary sanctions and the previously-ordered conjoint counseling, the mother requested "makeup visitation."

The Department prepared another addendum report, dated January 17, 2014. The mother had been regularly working as a house cleaner. She had visited with the children several times in December and was scheduled for visitations in January.

B.M.'s therapist had sent a letter dated December 19, 2013, stating that B.M. was not ready to talk to the mother about the sexual abuse. The Department made several attempts to contact B.M.'s therapist to inquire "about [an] alternative way of a resolution to this considering it remains as a court order." B.M.'s therapist had not yet responded.

The mother had been residing with her stepfather, but she no longer felt comfortable there because her stepfather had propositioned her while he was intoxicated. The mother was referred to a Parent Advocate on January 10, 2014 "to receive additional support with housing." However, the mother wanted to return to live with P.O. because she felt safer with him and did not have anywhere else to go. The mother believed she could "watch the girls and take better care of them" while living with P.O. The mother could not explain how she would take better care of the children. She wanted the restraining order lifted and she wanted P.O. to accompany her to a visit with the children.

The social worker opined that although both parents had completed their case plans, they had not completed the "objectives" of those plans. Specifically, the parents failed to take any responsibility for the children's sexual abuse, failed to identify risk

factors, and failed to develop a plan to prevent future sexual abuse. In particular, the mother still wanted to live with P.O., so if the children were returned to her, P.O. would have access to the children.

A second addendum report dated January 17, 2014 described the social worker's efforts to help the mother develop a plan to protect the children from further sexual abuse. The efforts included discussions at least once per month during the prior 12 months. The social worker had also made efforts to have more counseling authorized for the mother. She had asked the mother's therapist to send a letter regarding the completed sessions and to provide a summary of what would be accomplished in additional sessions. The social worker had requested additional funding for the mother's counseling, but the request had been denied.

The children filed a motion for a temporary restraining order against P.O. on January 17, 2014. At a hearing held that same day, the juvenile court issued the restraining order, which protected only the children. The juvenile court also granted the foster parents' request for de facto parent status.

At a hearing held on February 14, 2014, the juvenile court heard the mother's sanctions motion. The Department explained that the mother's missed visits were scheduled to be made up. The conjoint counseling had not yet occurred because B.M. told her therapist she did not want to talk to the mother about the sexual abuse. The social worker noted that the mother had not been supportive of B.M. following her disclosure, and that the mother wanted to question B.M. "to see why she was making those disclosures." The mother argued that the conjoint counseling had been court-ordered and that the therapist could have "stopped the conversation at any point" if B.M. felt uncomfortable. The court found that the Department had not willfully violated the order and denied the mother's request for sanctions.

13

### O.    *Contested 12-Month Review Hearing*

The contested 12-month review hearing was held on March 14 and March 28, 2014. P.O. did not appear at either hearing date. A criminal warrant had been issued for his arrest on charges of forcible lewd and lascivious acts with a minor. (See Pen. Code, § 288, subd. (b).)

The social worker testified about the reunification efforts made by the Department. The social worker had been in regular contact with the service providers and had supervised some visitations. She had been in regular contact with the mother; they met at least once a month to discuss her case plan. The social worker had provided the mother with a Spanish-language handout about syphilis.

The social worker and therapist described their efforts to obtain funding for additional counseling for the mother after the mother completed her initial 12 sessions. In May of 2013, the social worker asked the mother's therapist to write a letter stating that the mother would meet her therapeutic goals with an additional 12 sessions. The therapist did not want to write the letter because she could not guarantee that anyone will reach specific service goals through psychotherapy, so instead of sending the requested letter, she sent a treatment summary. In June 2013, the social worker submitted a request for additional funding, but it was denied. In November of 2013, the social worker submitted another request, but that request was also denied. In January of 2014, the therapist offered to write a letter proposing a treatment plan but not guaranteeing the treatment goals would be met. The social worker submitted a third request, along with the letter from the therapist, and the funding was approved in February of 2014.

By March 28, 2014, the mother had participated in seven more counseling sessions with her therapist. The therapist felt that the mother was " 'coming around' " but noted that the mother had "continued communication" with P.O.

The social worker explained why she had not arranged for the mother to participate in conjoint counseling with B.M. After the court ordered conjoint counseling

14

in November of 2013, the social worker had contacted B.M.'s therapist. B.M.'s therapist felt it was not "therapeutically advisable" to have conjoint counseling until she had talked with B.M. about the disclosure. B.M.'s therapist had subsequently advised the social worker that B.M. felt uncomfortable about having conjoint counseling with the mother. B.M. did not want to discuss her disclosure, and her therapist wanted to establish trust with B.M. so B.M. could identify and express her feelings.

The social worker noted that even after B.M. disclosed that P.O. had sexually abused her, and even after the court had suspended P.O.'s visitations, the mother had asked if P.O. could visit the children. The social worker believed the mother intended to be in a relationship with P.O. and that the mother would not set limits on the "kind of contact" P.O. would have with the children since she had not yet "completely accepted" the fact that P.O. had sexually abused her daughters.

The social worker opined that it would be detrimental to return the children to the mother's home because the mother had not alleviated the conditions leading to the children's removal. The social worker was concerned about the mother's ability to protect the children from further sexual abuse, particularly by P.O. When asked to identify additional available services that could have helped the mother, the social worker identified only further individual counseling.

At the time of trial, the mother was again living with her stepfather, who had propositioned her in January of 2014, and another adult man. The mother testified that an uncle tried to abuse her when she was young. The mother told her parents, but they did not believe her.

The mother described finding out that B.M. made allegations about P.O. "behind [her] back." She acknowledged that "someone" hurt her children and that according to "a comment" by B.M., it was P.O. She admitted that she initially called B.M. a liar but claimed she now believed that P.O. had molested B.M.

15

Asked what she would do to protect her children if they were returned to her, the mother stated, "Well, I would protect them more than I use[d] to." When asked for specifics, the mother stated, "I would want [B.M.] to trust me more. And I would pay more attention to the three of them." The mother asserted that if someone hurt her children, she would call the police even if the perpetrator was someone she cared about. She would not keep living with a person who hurt her children.

The mother explained that she had separated from P.O. because of his "mistreatment" of her. However, she had contact with him frequently and had seen him the day before her testimony. She exchanged text messages with P.O. and had seen where he was living. She sometimes saw him "several times" per week, although sometimes she only saw him because he was giving her money.

The mother denied that she wanted to be in a relationship with P.O., explaining she knew that she would lose her children. She acknowledged that she had asked the restraining order to be changed so P.O. could have "a little bit of right" to see the children.

### P.     The Parties' Arguments and the Juvenile Court's Findings

At the end of the contested hearing, the Department argued that returning the children to the mother's home presented a substantial risk of detriment and that reasonable services had been provided to the mother. The Department noted that the social worker had tried to help the mother develop a safety plan for a year but that the mother still could not clearly articulate such a plan. Counsel for the children joined in the Department's argument.

The mother argued that the Department could have obtained funding for more counseling sooner. She argued that once the perpetrator was known, different services should have been provided to her. She argued that the Department should have set up separate visits for her and P.O. sooner.

16

In announcing its findings, the juvenile court described the case as "difficult and complex." The court found it "perplexing" and "phenomenal" that the parents could comply with services but not explain what had happened to their children. The court noted that when B.M. disclosed that P.O. was the perpetrator, the mother did not believe B.M. and called her a liar. The court further noted that the mother continued her relationship with P.O. even after saying she would leave him. While this may have been partly "motivated by finances," that was "only part of the explanation." The court found that the mother's "regular and frequent contact" with P.O., which continued "long after the disclosure," was evidence of detriment since it showed the children would be vulnerable to future sexual assaults by P.O. The court found that the mother would "likely return to [P.O.]" as soon as the dependency proceedings were over. Finally, the court noted that the dependency system expects that when a parent knows the identity of a person who has committed sexual abuse against his or her children, that parent "will do anything and everything to remove themselves from that situation." The court noted that the mother could have cooperated with the police, had P.O. arrested, or applied for a U-visa, but that she had taken no such actions.

The juvenile court adopted the Department's recommendations. The court found that return of the children to the parents would create a substantial risk of detriment to their safety. The court further found, by clear and convincing evidence, that reasonable services had been offered by the Department. It terminated reunification services to the mother and P.O. and set the matter for a selection and implementation hearing (§ 366.26) on July 25, 2014.

### Q. The Mother's Writ Petition

The mother filed a petition for writ of mandate pursuant to California Rules of Court, rule 8.452 on May 1, 2014, seeking relief from the March 28, 2014 order setting the section 366.26 hearing. She contends that the juvenile court erred by finding that reasonable services had been provided.

17

# III. DISCUSSION

Before evaluating the mother's contentions, we will provide an overview of the applicable legal principles and the applicable standard of review.

## A. *Legal Principles*

Section 361.5, subdivision (a) generally mandates that reunification services are to be provided whenever a child is removed from the parents' custody. (See *In re Luke L.* (1996) 44 Cal.App.4th 670, 678.)

When a child is over three years of age at the time of removal, reunification services are presumptively limited to 12 months. (§ 361.5, subd. (a)(1)(A).) When a child is under three years of age at the time of removal, reunification services are presumptively limited to six months. (*Id.*, subd. (a)(1)(B).) When a sibling group is removed from parental custody at the same time and one member of the sibling group was under three years of age on the date of initial removal, reunification services for some or all of the sibling group may be subject to the six-month limitation. (*Id.*, subd. (a)(1)(C).) Reunification services may be extended up to 18 months from the date of removal if the juvenile court finds a substantial probability that the child will be returned to the physical custody of his or her parent or guardian within that extended time period or that reasonable services have not been provided to the parent or guardian. (*Id.,* subd. (a)(3).)

"Reunification services must be 'designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300.' (§ 362, subd. (c).) Accordingly, a reunification plan must be appropriately based on the particular family's 'unique facts.' [Citation.]" (*In re T.G.* (2010) 188 Cal.App.4th 687, 696.) " ' "[T]he record should show that the [Department] identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable

18

efforts to assist the parents in areas where compliance proved difficult. . . ." [Citation.]'
[Citation.]" (*Id.* at p. 697.)

"Only where there is clear and convincing evidence the [Department] has provided or offered reasonable services may the court order a section 366.26 hearing." (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1165 (*Robin V.*); see § 366.21, subd. (g)(2).) "The adequacy of reunification plans and the reasonableness of the [Department's] efforts are judged according to the circumstances of each case." (*Robin V., supra,* at p. 1164.) That additional services might have been possible, or that the services provided were not the services the parent thought were best for the family, does not render the services offered or provided inadequate. "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547 (*Misako R.*).)

On appeal, the applicable standard of review is substantial evidence. (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688.) "In reviewing the reasonableness of the services provided, this court must view the evidence in a light most favorable to the [Department]. We must indulge in all legitimate and reasonable inferences to uphold the [juvenile court's findings]. If there is substantial evidence supporting the judgment, our duty ends and the judgment must not be disturbed." (*Misako R., supra,* 2 Cal.App.4th at p. 545.) "We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53.)

### B.    Analysis

As noted above, the mother contends the juvenile court erred by finding that reasonable services had been provided. The mother argues that the Department "failed to provide the mother virtually any services for approximately nine months; failed to

19

provide court ordered services; and, failed to offer the mother services in a manner that were tailored to her education, cultural background and status as a victim of a crime."

### 1.    Waiver

The Department first argues that to the extent the mother is challenging the case plan, she "waived that argument by failing to appeal" from the disposition and six-month review orders. However, a parent is "not required to complain about the lack of reunification services as a prerequisite to the [D]epartment fulfilling its statutory obligations." (*Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1014.) Because it was the Department's obligation to provide reasonable reunification services, we conclude that mother did not waive the issue in any respect by failing to challenge the case plan at disposition or the six-month hearing. (See *Melinda K. v. Superior Court* (2004) 116 Cal.App.4th 1147, 1158 (*Melinda K.*).)

### 2.    Initial 12-Month Reunification Period

We first address the reasonableness of reunification services provided during the initial 12-month reunification period, which was before B.M.'s disclosure that P.O. was the perpetrator of the sexual abuse. Those services included regular visitation with the children, parenting classes, domestic violence classes, and 12 sessions of individual counseling aimed at helping the mother understand that her children had been sexually abused and helping her develop a safety plan to prevent further sexual abuse. In addition, the social worker met with the mother regularly, tried to help the mother understand that her children had been sexually abused, and tried to help the mother develop a safety plan to prevent further sexual abuse.

During the proceedings below, the mother's chief complaint was that the Department should have obtained funding for further individual counseling for her earlier. The mother repeats this claim in her writ petition.

After the mother completed her initial 12 sessions of individual counseling, the therapist recommended she "continu[e] in further counseling services," and the juvenile

20

court ordered the Department to "look into more funding" for such counseling but did not specifically order the Department to provide additional counseling.

The social worker complied with the order to "look into more funding" for additional counseling. The social worker needed a "Director's approval" for additional sessions. In order to get that approval, the social worker needed the mother's therapist to write a letter stating that the mother would meet her therapeutic goals with an additional 12 sessions. The therapist did not provide the required letter because she did not want to guarantee that the mother would reach any specific service goals. Nevertheless, the social worker submitted requests for additional funding in June 2013 and November of 2013. Both requests were denied. The funding was approved in February 2014, after the social worker's third request, which was submitted in January 2014 along with a letter from the therapist that set forth a proposed treatment plan.

In addition to making efforts to obtain additional funding for more individual counseling, the social worker looked into a group for parents with children who are victims of sexual abuse. However, the mother did not qualify for the group.

On this record, we cannot say that the Department failed to provide reasonable services to the mother because it did not obtain funding for additional individual counseling until February of 2014. The mother did receive 12 sessions of individual counseling between February 2013 and May 2013, and she did not indicate she wished to participate in additional individual counseling after those sessions ended. In fact, the mother stated that the 12 sessions "were sufficient for her learning process." (See *In re Christina L.* (1992) 3 Cal.App.4th 404, 414 (*Christina L.*) [reunification services " 'cannot be forced on an unwilling or indifferent parent' "].)

Even assuming that the initial 12 sessions of individual counseling were insufficient and that the Department did not make reasonable efforts to obtain timely funding for additional counseling, the mother did attend seven additional sessions by the end of the contested 12-month review hearing. (Cf. *Melinda K., supra,* 116 Cal.App.4th

21

at p. 1159 [delay in the minor's individual counseling may have "rendered the services provided imperfect, but rarely will services be perfect"].) After 19 sessions of individual counseling, the mother still maintained frequent contact with P.O., the perpetrator of the sexual abuse of her children. The mother still could not state any specific ways in which she would protect the children if they were returned to her. The mother remained equivocal about whether she believed that P.O. was actually the perpetrator, and she still believed that P.O. should be able to see the children. Thus, by the time the juvenile court found that reasonable services had been offered, the mother had actually received additional individual counseling, but the court nevertheless found that returning the children to her would be detrimental. Nothing in the record suggests that earlier funding for the additional counseling would have changed the outcome of the contested 12-month review hearing.

The mother next contends that during the initial 12 months of reunification services, the Department should have investigated what other adults had lived in the family home, identified P.O. as the "prime suspect," and not allowed P.O. to have equal access to the children. The mother does not provide any authority for her assertion that, as part of its reunification services, the Department had a duty to investigate possible perpetrators other than the parents. But even assuming that the Department did have such a duty, nothing in the record shows that the Department could have discovered that P.O. was the perpetrator, because the mother consistently denied that anyone, including P.O., had access to the children. Likewise, the mother does not provide any authority for her claim that the Department should have limited P.O.'s visitation before there was evidence that he had sexually abused the children. Until B.M.'s disclosure, P.O. was receiving reunification services himself, and the Department was focused on reunifying the family. (See *In re Daniel G.* (1994) 25 Cal.App.4th 1205, 1211 [one goal of dependency system is "preserving the family whenever possible"].) Moreover, even after B.M.'s disclosure, the mother advocated for P.O. to have equal access to the children.

22

The mother also contends that the Department should have provided her with additional medical education about sexually transmitted diseases. However, the record shows that the Department provided her with a substantial amount of information about sexually transmitted diseases. At the beginning of this case, the social worker explained to the mother the process by which sexually transmitted diseases were contracted, and the mother stated "that she knew because it had already been explained to her by the doctors." The social worker also provided the mother with a Spanish-language handout about syphilis and a referral to Planned Parenthood, where she could get tested for sexually transmitted diseases. The mother subsequently reported that she had gone for testing, had tested positive for syphilis, and had been prescribed an oral medication. The mother understood that she had contracted syphilis from P.O. On this record, we cannot say that that the Department should have done more to ensure the mother understood that syphilis was a sexually transmitted disease.

The record thus shows that during the initial 12-month reunification period, " ' "the [Department] identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult. . . ." [Citation.]' [Citation.]" (*In re T.G., supra,* 188 Cal.App.4th at p. 697.) Further, these services were appropriately based on this particular family's " 'unique facts.' " (*Id.* at p. 696.) On this record, substantial evidence supports the juvenile court's finding that the Department made reasonable efforts to help the mother reunify with the children during the first 12 months of the reunification period.

### 3.     Post-Disclosure Period

We next address the mother's contentions relating to the Department's efforts following B.M.'s disclosure, in October of 2013, that P.O. was the perpetrator of the sexual abuse. Importantly, by that time, the mother had already received over 12 months

of services.[2]  (See *In re Zacharia D.* (1993) 6 Cal.4th 435, 446 [pursuant to § 361.5, subd. (a), the Legislature has presumptively limited reunification services to " 'a maximum time period not to exceed 12 months' "].)  Nevertheless, the mother contends that the Department should have offered her additional reunification services following B.M.'s disclosure.

First, the mother claims that the Department should have assisted her in becoming independent from P.O.  However, the social worker did provide such services.  The social worker discussed housing and employment with the mother on several occasions.  In November of 2013, the mother told the social worker that she was no longer living with P.O.  On January 10, 2014, after the mother reported that she no longer felt comfortable living with her stepfather, the social worker referred the mother to a Parent Advocate "to receive additional support with housing."  The mother, however, stated that she wanted to live with P.O.  As noted above, reunification services " 'cannot be forced on an unwilling or indifferent parent.  [Citation.]'  [Citation.]" (*Christina L., supra,* 3 Cal.App.4th at p. 414.)

Next, the mother claims that the Department should have coordinated with the police and helped her show the police where P.O. was living.  The mother fails to provide any authority for the proposition that reunification services should have included assisting her in providing information to the police.  But even assuming that the Department had such a duty, the Department knew the mother was in contact with the police following B.M.'s disclosure:  The social worker documented that on December 6, 2013, the mother stated she had met with a detective.  The social worker could reasonably assume that the detective asked for the mother's assistance in locating P.O.  Moreover, even if the social worker had tried to help the mother in communicating with

---

[2] Reunification services were ordered at the August 24, 2012 jurisdiction/ disposition hearing.  B.M. disclosed that P.O. was the perpetrator of the sexual abuse 14 months later, on October 23, 2013.

24

the police about P.O.'s whereabouts, it is not clear that the mother would have been willing to assist the police in finding P.O. Even after B.M.'s disclosure, the mother indicated she did not believe that P.O. was the perpetrator and wanted to continue her relationship with him. It would be speculative to conclude that the mother would have provided the police with assistance in finding P.O. if the social worker had further encouraged her to do so. Finally, the social worker tried to help the mother come up with a safety plan to protect her children throughout the proceedings. As the mother was "on notice" of her responsibility to protect her children from further abuse, it was not incumbent upon the Department to take the mother "by the hand" and help her communicate further with the police. (See *In re Michael S.* (1987) 188 Cal.App.3d 1448, 1463, fn. 5.)

The mother also claims that the Department should have helped her obtain a U-visa.[3] Although the juvenile court cited the mother's failure to obtain a U-visa as evidence that the mother failed to demonstrate sufficient progress in her case plan, the court's remark does not mean that the Department had an obligation to assist the mother with obtaining a U-visa. The juvenile court's comment was made as part of its finding that despite all of the services offered to her by the Department, the mother failed to make any of her own efforts to separate herself from P.O.

Finally, the mother contends the Department should have arranged for conjoint counseling for herself and B.M. The mother relies on *In re Alvin R.* (2003) 108 Cal.App.4th 962 (*Alvin R.*). In *Alvin R.*, the minor child had been physically abused by his father. (*Id.* at p. 966.) The court initially ordered conjoint counseling for the child and the father to begin after the child completed eight sessions of individual counseling. (*Id.* at p. 967.) However, the agency was slow to obtain an individual counselor for the

---

[3] Pursuant to title 8 of the Code of Federal Regulations, section 214.14, "An alien is eligible for U-1 nonimmigrant status" if he or she "has suffered substantial physical or mental abuse" as a result of having been a victim of domestic violence.

child, and by the time of the six-month review hearing, the child had yet to complete the individual counseling. As a result, the father had not been able to participate in conjoint counseling or have visitation. (*Id.* at pp. 968-969.) The appellate court found no substantial evidence to support the finding that reasonable reunification services had been provided. (*Id.* at pp. 972-973.)

In the instant case, the mother did not receive conjoint counseling with B.M. even after it was ordered by the juvenile court. However, *Alvin R.* is distinguishable from the matter at hand. The father in *Alvin R.* never received any of the conjoint counseling or visitation that was key to reunification because the child did not receive the individual counseling that was needed prior to the conjoint sessions. Here, throughout the proceedings, the mother visited with the children and B.M. received individual counseling. Also, the mother received 12 sessions of individual counseling in addition to numerous other reunification services. Despite the individual counseling and other services, the mother still failed to support B.M. after her disclosure, and B.M. therefore did not want to engage in the conjoint counseling. In addition, B.M. was still reluctant to discuss her disclosure, and her therapist did not think it was "therapeutically advisable" to have conjoint counseling until she had talked with B.M. and established trust.

In sum, although the mother has pointed out that additional services might have been possible following B.M.'s disclosure, the services offered to her were "reasonable under the circumstances." (*Misako R., supra,* 2 Cal.App.4th at p. 547.) The record contains substantial evidence to support the juvenile court's finding that even after the initial 12-month reunification period, the Department provided reasonable reunification services to the mother.

## IV.    DISPOSITION

The petition for writ of mandate is denied.

26

_____

BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____

MIHARA, J.

_____

GROVER, J.